IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | |
| | : | Case No.  13-23527-GLT |
| MARC A. PRESUTTI, | : | Chapter 13 |
| | : | |
| Debtor. | : | |
| | : | |
| KAREN SIBBET, *et al.*, | : | Adv. Pro. No. 13-02431-GLT |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MARC A. PRESUTTI, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM OPINION

This matter is before the Court on the Plaintiffs' *Second Amended Complaint to Determine Dischargeability of Debt Under 11 U.S.C. § 523* [Doc. No. 48] (the "Complaint").  In the Complaint, Karen, George, and Brendan Sibbet (collectively, the "Sibbets") seek to except from Marc Presutti's bankruptcy discharge certain debts related to his management of the Superior Specialty Company Profit Sharing Plan (the "Plan").  The Sibbets argue that the debts should be excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4).  The Sibbets also include a count to pierce the corporate veil for the purpose of imputing the liability of Superior Specialty Company upon the Debtor.

### I.

Superior Specialty Company ("Superior") was a business engaged in the sale of plumbing, heating, and hardware repair parts to hospitals, schools, and other

1

institutions.    Incorporated in 1961, the business was primarily owned by Ronald D'Ascenzo until his death in March 2005.  For much of its history, the company had low earnings. (Day 1 Trial Transcript ("Tr.") at 139:12-24).  This condition worsened when Superior's sales steadily declined, resulting in operating losses in the four years preceding D'Ascenzo's death. (See Plf. Ex. 11 at 22).

The Sibbets were long-time employees of company.  Karen Sibbet began her employment in 1969 and worked her way through the ranks.  When illness prevented D'Ascenzo from continuing his day-to-day oversight of Superior in 1998, Karen became president.  Her husband George and son Brendan also worked for the company in various capacities for approximately 13 years.

After D'Ascenzo passed away, his son, Matthew D'Ascenzo, endeavored to sell the Superior stock held by the Estate of Ronald D'Ascenzo (the "Estate").[1]  In doing so, Matthew D'Ascenzo sought to relieve his mother and the Estate of their obligations under personal guaranty agreements granted to PNC Bank to support Superior's business loans.  The potential liability under the guaranty agreements was approximately $400,000.  Although the Sibbets expressed an interest in acquiring a controlling interest in the company, Matthew D'Ascenzo did not pursue this option because he did not think PNC would accept them as replacement guarantors.

In November 2005, the Estate sold its shares in Superior to Presutti.  At the time, Presutti was the sole owner of Innovative Technologies Plus, Inc. ("Innovative"), an S-Corporation that provided computer consulting services to Superior.

---

[1]     Matthew D'Ascenzo was not involved in Superior's business operations prior to his father's death, nor does it appear that he wanted to assume that role afterwards.  He testified that given the precarious nature of the company's financials, liquidation was a distinct possibility if a stock sale could not be completed within one year.

2

Presutti agreed to pay $225,000 for the Estate's 78% stake in the company. The terms of purchase required an initial payment of $50,000 with the remaining balance paid over time. (See Def. Ex. 1). Presutti and his then-wife, Kaye Presutti, also agreed to assume the liabilities under the personal guaranty agreements with PNC. Presutti has not paid the full purchase price for the shares, and Matthew D'Ascenzo indicated during trial that he did not expect to receive any further payments from Presutti, nor did he intend to pursue Presutti for any unpaid amounts.

Upon taking control of Superior, Presutti named himself chief executive officer. Karen Sibbet remained as president, but George Sibbet was replaced as treasurer by Kaye Presutti. Presutti set his own salary at $125,000 per year. (Day 2 Tr. at 41:8-11). As the majority shareholder, no other shareholder, including Karen Sibbet, had any authority to overrule or otherwise renegotiate his salary. (Id. at 41:12-18). Presutti, however, never received his full annual salary. (Id. at 41:8-11). In recognition of Superior's perilous financial condition, he deferred the vast majority of his salary and only received $1,000 per pay period, or $24,000 per year. (Id. at 42:9-13).

Superior had, for a long time prior to Presutti's purchase of the Estate's shares, operated an Employee Stock Option Plan that was governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132. The ESOP was subsequently converted into a profit sharing plan, but the purpose of the Plan remained the same, to provide a retirement investment tool to Superior's employees. The terms of the Plan were set forth in boilerplate "prototype" document that, pursuant to generally

3

accepted practice, contained certain amendments specific to Superior's business.  (Plf. Ex. 14; Day 1 Tr. at 61, 240).[2]

The Plan's primary asset was its shares of Superior stock.[3]  After the conclusion of each calendar year, Superior obtained a per-share valuation of the stock for the purpose of informing each participant of the value of their respective holdings in the Plan.[4]  The stock value was driven largely by the value of Superior's most significant asset, its real estate located at 256 Kappa Dr., Pittsburgh, PA 15238 (the "Facility").  Prior to his death, Ronald D'Ascenzo listed the Facility for sale at $900,000, but it did not sell.  (Day 1 Tr. at 142).

After Presutti acquired his shares, Superior's business continued to struggle.[5]  The company was unable to stem a sharp decline in sales, prompting one valuation expert to label it as "the living dead" meaning that "it's a business that's alive, but it's going nowhere."  (Day 1 Tr. at 161:17-19).  The parties dispute the cause of Superior's poor financial condition.  Presutti suggests it was the result of the economic recession and decreased demand in product offerings.  The Sibbets allege that Presutti looted Superior for his own benefit by paying numerous personal expenses with company funds.

---

[2]   The *Prototype Defined Contribution Plan* (the "Basic Plan Document") was implemented by Superior pursuant to the terms of a *Nonstandardized Adoption Agreement Prototype Profit-Sharing Plan* (the "Adoption Agreement").  (Plf. Ex. 14; Day 1 Tr. at 61, 240).  The Basic Plan Document, Adoption Agreement, and all related amendments are collectively referenced herein as the "Plan Documents."

[3]   At various times, the Plan also held small amounts of cash, but the cash was a byproduct of the stock, not the primary asset.

[4]   A sample shareholder statement was admitted at Plaintiffs' Exhibit 20.

[5]   Superior showed a profit in 2006, the first full year under Presutti's control.  The operating losses continued thereafter, however, as Superior posted a loss in 2007 and 2008.  In all, Superior showed operating losses in four of the five years during this period (2004, 2005, 2007, and 2008).  (Plf. Ex. 13 at 29).

Superior terminated the Sibbets' employment on May 29, 2009 after they refused to accept a substantial salary reduction. Approximately one year later, the business ceased operations entirely. On May 17, 2010, Superior sold the Facility for a contract price of $586,400. After accounting for settlement charges and the payoff of PNC Bank's secured loans, Superior received $256,869.47 from the sale. (Def. Ex. 4). Superior used the net sale proceeds to pay, among other things, the following items: (i) outstanding invoices owed to Innovative; (ii) a loan made by Dr. Donald Dazen; (iii) professional fees incurred during the wind up of the business; (iv) certain trade creditors; and (v) approximately $70,000 in unpaid salary to Presutti. (See Def. Ex. 6). The sale of the Facility did not generate sufficient proceeds to pay all of Superior's creditors in full and, to this date, several unpaid creditors remain.

The Sibbets have a vested balance in the Plan. As of December 31, 2008, Karen Sibbet's balance was $18,589.94, George Sibbet's balance was $1,699.51, and Brendan Sibbet's balance was $5.96. The Sibbets requested a distribution from their Plan accounts by submitting their Distribution Request Forms to Superior on or before June 18, 2009. (Plf. Exs. 29, 37-39). An additional demand was made by letter dated June 30, 2009 from an attorney representing the Sibbets. (Plf. Ex. 56). On July 27, 2009, Superior's attorney responded that the Plan was being re-evaluated and Superior would provide its valuation report upon completion. (Plf. Ex. 57). Superior never provided the report and, in fact, never processed a valuation for any year after 2008.

On March 25, 2010, the Sibbets commenced an action against Superior and Presutti in the Court of Common Pleas of Allegheny County, Pennsylvania (the "State Court Action") for breach of certain employment agreements and violations of

Pennsylvania's Wage Payment and Collection Law, 43 P.S. § 260, *et seq.* On May 29, 2013, the Sibbets filed an additional complaint against Superior, the Plan, and Presutti before the United States District Court for the Western District of Pennsylvania (the "District Court Action"). In the District Court Action, the Sibbets allege, among other things, claims for breach of fiduciary duties under ERISA.

Presutti initiated the current bankruptcy proceeding by filing a voluntary petition for relief under chapter 13 of title 11 of the United States Code (the "Bankruptcy Code") on August 21, 2013 (the "Petition Date"). Both the State Court Action and District Court Action have been stayed by the filing of the bankruptcy petition.

The Sibbets filed their Complaint in this adversary proceeding on December 13, 2013. After obtaining leave of this Court, the Sibbets filed an amended complaint on January 22, 2015 (the "Amended Complaint") to include, among other things, a count to pierce the corporate veil of Superior. The Sibbets allege that Presutti breached his fiduciary duties by stripping the Plan of its assets by selling the Facility and converting the net proceeds to his own personal use. They also claim that he improperly diverted company funds for his personal use to pay for travel expenses, cosmetic surgery, and membership dues that were unrelated to Superior's business.

The Court conducted an evidentiary hearing on the Complaint over the course of three days, after which the parties submitted post-trial briefs. The matter is now ripe for adjudication.

## II.

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

6

As an initial matter, Presutti contends that the Amended Complaint is barred as a matter of law because the Sibbets' claims arise under ERISA and the statute of limitations for ERISA claims has now lapsed.[6]  Once the limitations period expires, Presutti argues the ERISA claims cannot be resuscitated by re-casting them as exceptions to discharge under Section 523 of the Bankruptcy Code.  The Sibbets contend their claims were timely pursued and, if not, the applicable limitations period was tolled due to misrepresentations made about Superior's efforts to obtain a stock valuation for the Plan. The Court must address this issue before progressing further.

### A.
### The ERISA Statute of Limitations

The Court's analysis begins with 29 U.S.C. § 1113, the applicable statute of limitation for ERISA claims.[7]  Section 1113 "creates a general six year statute of limitations, shortened to three years in cases where the plaintiff has actual knowledge,

---

[6]    The Court finds that Presutti has properly preserved this defense in each answer filed with the Court.  Because Presutti did not move to dismiss the case until trial had commenced, this is the first instance the Court has had to address the matter on the merits.

Although Presutti raises an additional defense that he cannot be held personally liable for a breach caused by either Superior or the Plan (a defense the Sibbets counter with their request to pierce the corporate veil), the Court need not address these issues if the claims are barred by the applicable ERISA limitations periods.

[7]    Section 1113 provides:

No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part [29 USCS §§ 1101 et seq.], or with respect to a violation of this part [29 USCS §§ 1101 et seq.], after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

and potentially extended to six years from the date of discovery in cases involving fraud or concealment." Kurz v. Philadelphia Elec., Co., 96 F.3d 1544, 1551 (3d Cir. 1996).

The Court finds that the statute of limitations set forth in section 1113 applies to the Sibbets' ERISA fiduciary claims. See 29 U.S.C. § 1113. In the Complaint filed in the District Court Action (the "ERISA Complaint") (attached as Ex. B to the Amended Complaint), the Sibbets allege six counts. Count I alleges a breach pursuant to 29 U.S.C. § 1104(a)(1), Count II alleges a breach pursuant to 29 U.S.C. § 1105, Count III alleges a breach pursuant to 29 U.S.C. § 1106, Count IV alleges a breach pursuant to 29 U.S.C. § 1109, and Count V alleges a breach under 29 U.S.C. § 1024.[8]  Accordingly, those underlying causes of action are subject to section 1113, and the Court begins its analysis of whether an action must be commenced within three years or six years, or whether a longer period applies due to a finding of fraud or concealment on the part of Presutti.[9]

The Sibbets allege the operative breach was Superior's failure to make the required Plan distributions following the termination of their employment.  (See Amended Complaint, at ¶¶ 20-23).  They argue that the six-year statute of limitation did not begin to run until June 10, 2010,[10] and because they filed the ERISA Complaint on

---

[8]     The averments in Count V relate to an alleged breach of 29 U.S.C. § 1024(b)(4) for failing to supply required information to plan participants.  Count VI simply alleges a breach of contract action, but the Court finds the substance of Count VI is subsumed in Counts I-V.  The Court concludes that these claims do not fall within the scope of the Section 523 action currently pending before the Court.

[9]     Count III of the Amended Complaint is an action to pierce the corporate veil.  The Defendant argues that the two-year statute of limitation found in 42 Pa. C.S.A. § 5524(7) applies to Count III. See 42 Pa. C.S.A. § 5524(7).  The Court finds that because Count III derives from and is inextricably linked to the causes of action alleged in the ERISA Complaint, section 5524(7) is inapplicable and the ERISA statute of limitations (section 1113) controls.

[10]    The Sibbets target June 10, 2010 as the date Presutti (through counsel) allegedly made false and fraudulent statements concerning the valuation of the Plan and the prospect of an eventual

May 29, 2013, the District Court Action was commenced well within the six-year limitation period. (See *Plaintiffs' Response to Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint* [Doc. No. 59], at ¶5).[11] Presutti argues that the three-year statute of limitation applies. (See *Motion to Dismiss Plaintiffs' Second Amended Complaint* [Doc. No. 56], at ¶ 17).

The statute of limitations defense is an affirmative defense in which the defendant bears the burden of proof. See Godshall v. Franklin Mint Co., 285 F. Supp. 2d 628, 633 (E.D. Pa. 2003). With respect to the Sibbets' ERISA claims, the default statute of limitations is a six-year period. In order to shorten the period to three years, Presutti must prove that the Sibbets had actual knowledge of the breach or violation in the three years that preceded the filing of the ERISA Complaint. See Kurz, 96 F.3d at 1551; see also Gluck v. Unisys Corp., 960 F.2d 1168, 1177 (3d Cir. 1992) ("[A]ctual knowledge of all material facts constituting a breach of fiduciary duty or violation of ERISA is the *sine qua non* for application of section 1113's three-year limitations. A plaintiff must have, in the plain words of the statute, 'actual knowledge of the breach or violation.'"). Gluck is the seminal Third Circuit case that defines actual knowledge in this context. In Gluck, the Third Circuit held that a finding of actual knowledge "requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists,

---

distribution. (See *Amended Complaint* at ¶ 26 [Dkt. No. 46]; *Response to Motion to Dismiss* at 2-3 [Dkt. No. 54]). From a review of the record, it appears the Sibbets are instead referring to a June 17, 2010 letter sent by Superior's attorney, Gary Gunnett, to the Sibbets' counsel. (See Plf. Ex. 36). It is the June 17, 2010 letter by which the Sibbets were given copies of the 2006, 2007, and 2008 stock valuations and told that "[f]urther information regarding the termination of the Plan and the distribution of all accrued benefits will be provided to all participants in the Plan shortly."

[11]    The Sibbets rely upon the second clause in section 1113(2) as the applicable limitation period. This provision states that the six-year limitation period begins to run only after the plaintiff discovers the breach. As a result, this provision could lead to applicable limitation periods that extend beyond six years from the actual violation.

which facts could include necessary opinions of experts, knowledge of a transaction's

harmful consequences, or even actual harm." Gluck, 960 F.2d at 1177 (internal citations

omitted). Over time, the Third Circuit has gradually refined the definition of "actual

knowledge" without disturbing the foundation laid in Gluck.[12]

Courts must apply a heightened standard before finding actual knowledge.

Roush, 311 F.3d at 585; see also Montrose Med. Grp. Participating Sav. Plan v. Bulger,

243 F.3d 773, 787 (3d Cir. 2001) (holding that the actual knowledge requirement

triggering ERISA's shorter, three-year statute of limitations is interpreted "stringently"

and sets a "high standard for barring claims") (internal citations omitted). Following

controlling Third Circuit case law, the Court may not apply the three-year statute of

limitations unless it finds that the Sibbets (a) knew that the failure to receive their Plan

payments was a fiduciary breach, and (b) the breach constituted a violation of ERISA.[13]

In pursuing this analysis, the Court is guided by Chief Judge Joy Flowers

Conti's recent opinion, Williams v. The Webb Law Firm, P.C., Case No. 12-1702, 2014

U.S. Dist. LEXIS 104434 (W.D. Pa. July 31, 2014). In Williams, an attorney sued The

Webb Law Firm, P.C. (the "Webb Firm") for breaching fiduciary duties allegedly owed

to him under ERISA. Specifically, the plaintiff argued that the Webb Firm misclassified

---

[12]  See Int'l Union of Elec. v. Murata Erie N. Am., 980 F.2d 889, 901 (3d Cir. 1992) (a finding of
actual knowledge "therefore requires a showing that plaintiffs actually knew not only of the events
that occurred which constitute the breach or violation but also that those events supported a claim
of breach of fiduciary duty or violation under ERISA."). This test has remained in place since
1992. See Richard B. Roush, Inc. Profit Sharing Plan v. New England Mut. Life Ins. Co., 311
F.3d 581, 585 (3d Cir. 2002) (same); Connell v. Trustees of the Pension Fund of the Ironworkers
Dist. Council, 118 F.3d 154, 157 (3d Cir. 1997) (same); Kurz, 96 F.3d at 1551 (same).

[13]  See Lewis v. Allegheny Ludlum Corp., Case No. 11-1619, 2013 U.S. Dist. LEXIS 109999, at *65-
66 (W.D. Pa. Aug. 2, 2013) (applying three-year statute of limitation to certain plaintiffs' claims
was appropriate because they had actual knowledge of the alleged breach of fiduciary duty);
Bidlingmeyer v. Broadspire, Case No. 11-812, 2011 U.S. Dist. LEXIS 109484 at * 5-6 (E.D. Pa.
Sept. 27, 2011) (applying three-year statute of limitation); Wells v. Genesis Health Ventures, Case
No. 05-697, 2005 U.S. Dist. LEXIS 42330 at * 7-8 (E.D. Pa. Nov. 23, 2005) (same).

him as an independent contractor, rather than an associate attorney, thereby depriving

him of certain benefits that he would otherwise be entitled to receive as an associate. Id.

at *1-6.[14]

Williams began working with the Webb Firm as an independent contractor

in January 2001 and was named an associate attorney in July 2001. By November 2005,

Williams' employment status reverted back to an independent contractor. In May 2007,

Williams approached the Webb Firm about becoming an associate attorney again in order

to qualify for medical insurance.[15] Rather than make him an associate attorney, the Webb

Firm agreed to pay a percentage of Williams' monthly medical insurance costs,

depending on the number of hours he billed.[16] Williams argued that because he was

performing the same tasks as an associate attorney at the Webb Firm, he should have

been classified as an employee and received the benefits to which an associate attorney

was entitled.

Judge Conti granted the Webb Firm's motion for summary judgment and

found that Williams' claims were barred by the three-year statute of limitation in section

1113 because he had actual knowledge of his employment classification and that he was

not entitled to benefits as an independent contractor. Id. at *36. Judge Conti concluded

that Williams knew no later than May 2007 that he would not receive benefits from the

---

[14]    For example, at the time he was an associate attorney, the Webb Firm provided Williams with
medical insurance, access to a 401K plan (matching up to 1% of his salary), access to a profit
sharing plan (up to 3% of salary), life insurance, long-term disability, travel insurance, vacation
time, various association dues, and training expenses. Id. at *3. He was not entitled to these
benefits as an independent contractor.

[15]    Williams sought the change in employment status because his wife would soon begin working
part-time and would lose medical insurance.

[16]    By way of example, if Williams billed between 111 and 120 hours in a month, the Webb Firm
would pay 20% of his medical costs for the month. The Webb Firm also set benchmarks at 40%,
60%, 80%, and 100% which were tied to monthly billings. Id. at *5-6. If Williams billed more
than 151 hours in a month, the Webb Firm covered 100% of his medical costs that month.

Webb Firm as an independent contractor, but he did not file his complaint until November 8, 2012. A key factor undercutting Williams' argument was the unique employment history he had at the Webb Firm. He started as an independent contractor before becoming an associate attorney and then ultimately reverted back to an independent contractor. Judge Conti highlighted Williams' knowledge of the benefits available to associate attorneys. Williams received the benefits and knew, without doubt, that in 2005 when he reverted to an independent contractor, he would no longer receive benefits from the Webb Firm. Having enjoyed the perks of associate employment, Williams could not later claim that he was unaware he would forfeit those benefits as an independent contractor.

In this case, as in the Williams case, the Court finds that the three-year statute of limitation under section 1113 applies. The Court acknowledges the heightened standard that must be satisfied before applying the three-year period, but the threshold is met in this case because of the circumstances surrounding the Sibbets' employment and work experience. See Roush, 311 F.2d at 585. While the Court follows the analysis in the Williams decision, it finds the facts in this case are even more compelling than those presented in Williams.

The Sibbets had actual knowledge that the failure to receive their Plan payments was a fiduciary breach, and that the breach constituted a violation under ERISA. "A plaintiff has actual knowledge of a breach of a fiduciary duty or a violation of ERISA when he or she has actual knowledge of all material facts necessary to understand that some claim exists." Williams, 2014 U.S. Dist. LEXIS 104434, at *23-24.

In this case, the Sibbets knew that they were entitled to a distribution from the Plan within a reasonable amount of time following their termination from Superior.

To begin, the Sibbets were well aware of their right to receive a distribution from the Plan upon the occurrence of a qualifying event. Karen Sibbet signed her "Distribution Request Form" on May 29, 2009, the same day she was terminated by Superior. (See Plf. Ex. 37). George Sibbet and Brendan Sibbet signed their respective forms on June 18, 2009. (See Plf. Exs. 38 and 39). Within one month of being terminated from Superior, each of the Sibbets had asserted their rights to receive a distribution of their account balances from the Plan.

Karen Sibbet, in particular, was uniquely qualified to understand the Plan and how it functioned. For 11 years, she served as the President of Superior. (See Day 1 Trial Trans., at 213:18-20). During that time, the original ESOP converted into the current Plan[17] and Karen was tasked with performing the Plan's day-to-day administrative functions.[18] (See Day 1 Tr. at 216:8-217:3; 221:2-13). Among her job

---

[17]    See Day 1 Tr. at 216:4-5. The ESOP was converted to the Plan effective January 1, 2002. (See Plaintiffs Ex. 51). Karen Sibbet was Superior's President at the time the conversion occurred. See Day 1 Tr. at 213:18-20.

[18]    The Court notes that for the purposes of this Memorandum Opinion, when it discusses the "administration" of the Plan, it merely refers to the daily functions that must be performed to operate the Plan. During the trial, a question arose as to who (or what entity) served as the "plan administrator." The Sibbets argue that Presutti was the plan administrator because he signed a Form 5500 (Plf. Ex. 1) by the signature line "Plan Administrator."

Section 1.71 of the Basic Plan Document defines Plan Administrator as "[t]he Employer or individual(s) or entity(ies) appointed by the Employer to administer the Plan as provided at paragraph 12.1 herein." (See Plf. Ex. 14 at p. 16). By virtue of this language, Superior is the default "plan administrator" unless another person or entity was properly appointed. The Court finds no evidence in the record to suggest that any such appointment occurred. Without evidence to the contrary, the Court is left with no choice but to conclude that at all relevant times, Superior served as the Plan Administrator. The Court notes that Presutti's signature on the Form 5500 as the "Plan Administrator" occurred in his capacity as the CEO of Superior – much the same as Karen Sibbet previously signed prior Form 5500 documents on behalf of Superior in her capacity as President.

duties, Karen Sibbet sent distribution request forms to employees when a qualifying event occurred, forwarded the completed forms and corresponding payments to Huntington National Bank (the Plan trustee and custodian),[19] and sent annual statements to employees. (See Day 1 Tr. at 216:8-217:3; 221:2-13).

Karen Sibbet understood how Plan distributions were made because she was the only Superior employee who processed the payments. (See Day 1 Tr. at 223:13-16). The depth of her understanding was evident when, six years after her employment with Superior ended, she could still recall specific terms of the Plan.[20] Karen Sibbet also possessed a clear understanding of when distributions occurred. Under her supervision, the processing of Plan distributions ran smoothly and participants could expect to receive their first payment within 10 to 14 days of submission of the required materials to Huntington. (Day 1 Tr. at 236:11-13). In short, Karen Sibbet knew more about the Plan than any other employee, including Presutti.[21]

George and Brendan Sibbet similarly possessed actual knowledge of the circumstances that could lead to a claim against the Plan. After they submitted their distribution requests, both recognized that their claims remained unpaid in the months which followed. (Day 1 Tr. at 191:24 – 192:2; 199:9-11). They also failed to receive any subsequent account statements from the Plan. (Day 1 Tr. at 192:3-7; 196:10-18; 197:23-

---

[19]   If the Plan did not have sufficient cash on hand to make distributions to the Plan participants, Superior was required to issue a check to Huntington for the difference. (Day 1 Tr. at 118:17-119:1). At times, Superior would draw on its line of credit to cover the cost of buying back an employee's shares. (Day 2 Tr. at 77:14-19).

[20]   Among other specific terms, Karen Sibbet remembered that the amount and frequency of the Plan payments could vary depending on the size of the participant's account. Accounts with a balance of less than $5,000 were paid in a single, lump sum payment, while distributions in excess of that amount would be paid over time. (See Day 1 Tr. at 222:7-223:3; 223:13-16).

[21]   Presutti testified that he did not know how the Plan worked or how it was administered. See Day 2 Tr. at 169:14-170:9.

198:1; 202:13-18). Cognizant of these omissions, and with the ability to rely upon Karen for additional information,[22] George and Brendan were sufficiently knowledgeable of their circumstances so as to make the three-year limitations period applicable to their claims.

Upon finding that the Sibbets had actual knowledge of Superior's failure to make Plan distributions on their claims, the Court must now determine when the limitations period began to run. Williams, 2014 U.S. Dist. LEXIS 104434, at *22. The Court is guided in its analysis by the Plan Documents. (See Plf. Ex. 14). Article XVI.A.3.c of the Adoption Agreement provides that distributions payable upon an employment termination "shall be paid as soon as administratively feasible following the date on which a distribution is requested or is otherwise payable." (See Plf. Ex. 14; Day 1 Tr. at 44:2-7). When an employee is terminated in the middle of the year, his distribution is calculated using the last known share price for the preceding year. (See Day 1 Tr. at 78:15-79:6). The Sibbets were terminated in May 2009, and any Plan distribution payable on their accounts should have been calculated using the Superior stock price as it existed on December 31, 2008. (See Day 1 Tr. at 78:23-79:6).[23] At the

---

[22]    In reaching this conclusion, the Court finds that George and Brendan have actual knowledge of when a Plan distribution was likely to occur based on Karen's prior work experience. Although mindful that at least one court has cautioned against "the temptation to slide toward reliance upon constructive knowledge or imputed knowledge[,]" that danger is not present under the unique circumstances of this case. See Fish v. GreatBanc Trust Co., 749 F.3d 671, 679 (7th Cir. 2014). Through three separate judicial forums, the Sibbets have shared the same legal counsel and have chosen to pursue their claims collectively. They also share a close familial relationship and live in the same household. (See Plf. Exs. 37-39). Although George and Brendan each hold separate claims against the Plan, their claims have nominal value. It is the pursuit of Karen's account balance which is primarily driving this litigation. Upon consideration of these factors, the Court finds that the actual knowledge possessed by each of the Sibbets is indistinguishable as it relates the material facts necessary to establish an ERISA violation.

[23]    The Sibbets have subsequently argued that they "are entitled to distributions based upon the value of Superior Specialty Corporation as of the end of the calendar year 2009...." (See Plaintiffs' Response to Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint, Doc. No. 59,

15

time the Sibbets made their request in June 2009, the 2008 stock valuation had not been performed. (See Plf. Ex. 13; Day 1 Tr. at 148:15-18). The Court must therefore consider when it was reasonable to expect Superior to complete the valuation and make the required Plan distributions to the Sibbets.

After considering the testimony, the Court concludes that Plan distributions should have been paid to the Sibbets by the end of 2009. Superior obtained the 2008 stock valuation from Thomas Smith of Smith Valuation Services on October 14, 2009. (See Plf. Exs. 13, 23; Day 1 Tr. at 148-149).[24] Upon receipt of this report, the Plan had sufficient information to calculate and disburse the amounts due and owing to the Sibbets.

Moreover, the Sibbets recognized that their distributions were being unreasonably delayed. As noted above, Karen Sibbet was intimately familiar with how the Plan functioned, having previously supervised its day-to-day operations. She knew that distributions were typically made within two weeks of a submitted request. (See Day 1 Tr. at 236:11-13). Indeed, Karen Sibbet personally processed a distribution request for employee Linda Morece that was funded two days before Sibbet's employment was terminated. (Day 1 Tr. at 223:8-16; Plf. Ex. 33). She also knew when to expect a copy of the stock appraisal since the valuation reports were previously sent to her attention. (See Plf. Ex. 12; Day 1 Tr. at 225). When the Sibbets failed to receive a distribution in that

---

at ¶ 1). This argument, however, is not supported by the trial evidence. Indeed, Sibbets' own witness testified that the distribution should be made pursuant to the December 31, 2008 valuation. (See Trial Tr. Day 1, at 78:23-79:6). Further, the Sibbets do not acknowledge that the Superior stock may have been worthless in subsequent valuations. This fact does not excuse Superior's failure to have a valuation performed, but there was no guarantee that a 2009 year-end valuation would have shown value.

[24]  The appraisal established a value of $185 per share for the Superior stock as of December 31, 2008. (See Plf. Exs. 13, 23; Day 1 Tr. at 147:21-23).

16

time, they retained an attorney to pursue the amounts owed. (See Plf. Exs. 35 and 56). With the assistance of legal counsel, the Sibbets understood that a potential ERISA violation may have occurred due to Superior's failure to obtain a timely stock valuation for the Plan.[25]

Although the Sibbets could be subject to a limitations period beginning on September 11, 2009,[26] the Court will not apply that date based on the facts of record. While Superior had a history of obtaining appraisals much earlier in the year,[27] the evidence suggests that it was not uncommon for a stock valuation to take up to ten months to complete.[28]

Assuming that some additional time is necessary to process the Plan payments upon receipt of the appraisal, the Sibbets had a reasonable expectation that a distribution would occur no later than December 31, 2009. When they failed to receive a distribution or the stock valuation by the end of 2009, the Sibbets had actual knowledge of the material facts necessary to establish a claim for an ERISA violation due to

---

[25]    In a letter dated September 11, 2009 from Charles H. Saul, Esq. to Gusty Sunseri, Esq. (attorney for Superior), the Sibbets identified "serious ERISA ... issues" related to the Superior's failure to value the Plan in a timely manner:

> You indicated in your letter that the value of the ESOP was being reevaluated. Please advise, as soon as possible, as to the status of this reevaluation. It is noted that in the past, the evaluation was always done in March. The evaluation, therefore, is long overdue. As planned [sic] participants, the Sibbets are entitled to see copies of the evaluations, and it is hereby requested that copies of any evaluations taken during the last three years be provided to the Sibbets.

(See Plf. Ex. 35). The Sibbets received no response to this letter as of May 18, 2010, when their counsel re-submitted the Distribution Request Forms to Superior. (See Plf. Ex. 29).

[26]    (See Plf. Ex. 35).

[27]    The 2006 valuation was completed in July 2007, while the 2007 appraisal was finished in May 2008. (See Plf. Exs. 11, 12). According to Thomas Smith, owner of Smith Valuation Services, the release of the 2008 valuation report in late 2009 was unusual because it was delayed by the failure to obtain timely financial statements. (See Day 1 Tr. at 148:19-149:8).

[28]    (See Day 1 Tr. at 28:24-29:1).

Superior's failure to make the required payments and its inability to obtain a timely valuation. For these reasons, the Court finds that the three-year statute of limitation commenced on December 31, 2009 and expired on December 31, 2012. Because the Sibbets did not file the ERISA Complaint until May 29, 2013, the limitation period had already expired and their claims are now time-barred.[29]

### B.
### Tolling Due to Fraud or Concealment

To avoid the adverse impact of a three-year limitations period, the Sibbets argue that Superior and/or Presutti made fraudulent misrepresentations that extended the time for filing a complaint. They claim Presutti concealed crucial information that was "designed to put off the Plaintiffs by causing them to believe that valuations were being performed and that distributions would be made." (See *Response to Motion to Dismiss*, Doc. No. 54, at p. 2).[30] This argument misses the mark because the issue which gives rise to the Sibbets' claim – the failure to make the required distribution – was never concealed. The Sibbets were keenly aware that Superior did not provide the required payment and no assortment of excuses, explanations, or other rationales offered by Presutti or his lawyers can disguise that fact.

Section 1113 incorporates "the federal doctrine of fraudulent concealment: The statute of limitations is tolled until the plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged fraud or concealment."

---

[29]     Even if the Court found that the limitations period began to run on May 18, 2010, it would not alter the result in this case. Pursuant to a letter issued on that date, the Sibbets (through counsel) renewed their "formal request for distribution pursuant to the various Rules regarding the ESOP and ERISA." (See Plf. Ex. 29).

[30]     By seeking to proceed under the fraudulent concealment clause of section 1113, the Sibbets argue that the ERISA Complaint should be considered timely so long as it was filed within "six years after the date of discovery of such breach or violation." 29 U.S.C. § 1113.

Montrose Med. Grp., 243 F.3d at 788 (quoting Kurz, 96 F.3d at 1552).[31]   The Sibbets

must show that the filing of the ERISA Complaint was delayed because Superior or

Presutti concealed the fact that Superior breached its fiduciary duty to make a distribution

pursuant to the Plan.  See Montrose Med. Grp., 243 F.3d at 788 ("Section 1113 applies

when a lawsuit has been delayed because the defendant itself has taken steps to hide its

breach of fiduciary duty, and the relevant question is … not whether the complaint

sounds in concealment, but rather whether there is evidence that the defendant took

affirmative steps to hide its breach of fiduciary duty.  It is generally accepted that there

must be actual concealment,--i.e., some trick or contrivance intended to exclude

suspicion and prevent injury.") (internal citations and quotations omitted).  In Montrose,

the Third Circuit reversed the district court and found that the section 1113 limitation

period may have been tolled because the defendants represented that the plan at issue was

not covered by ERISA, when in fact it was; therefore, leading the plaintiffs to believe no

claims existed.  Id.

        The Court does not find sufficient evidence of concealment to justify an

extension of the limitations period.  The ERISA violations spring out of the Plan's failure

to make distributions to the Sibbets as required.   When the Sibbets submitted the

Distribution Request Forms, they each held a claim against the Plan for the value of their

account at a stock price determined as of December 31, 2008.  It was unnecessary for the

Sibbets to wait for a 2009 valuation to be performed, and they were aware of this fact.

Karen Sibbet was intimately familiar with the terms of the Plan and the time periods by

---

[31]    See also Brown v. Owens Corning Inv. Review Comm., 622 F.3d 564, 573 (6th Cir. 2010)
("ERISA's fraud exception to the statute of limitations requires the plaintiffs to show (1) that
defendants engaged in a course of conduct designed to conceal evidence of their alleged wrong-
doing and that (2) [the plaintiffs] were not on actual or constructive notice of that evidence, (3)
despite their exercise of diligence.") (internal quotation omitted).

which stock valuations and distributions were made. She was also aware that distributions could occur in the same year as a qualifying event because she herself processed those payments for other employees. Considering that the Sibbets were represented by experienced legal counsel during this process, the Court finds it unlikely that Superior or Presutti could materially mislead them about their rights under the Plan.

The Court also does not find it credible that the Sibbets would accept the veracity of any statements uttered on behalf of Superior or Presutti, particularly with respect to the Plan. The parties had a fractured relationship from the outset when Presutti, an outsider, took over the company. From there, he engaged in actions Karen Sibbet found to be distasteful or improper,[32] culminating in an ultimatum issued to the Sibbets in May 2009 when they were offered the choice of taking a 50% pay cut or losing their jobs. (Day 1 Tr. at 203:6-15).

The Sibbets were also profoundly aware that Presutti had no appetite for making Plan distributions to former employees. When Karen Sibbet attempted to fund Plan payments in the past, she encountered significant resistance from Presutti.[33] In one instance, he refused to authorize the payment. (Day 1 Tr. at 228:4-11). There is no reason to believe Presutti's attitude would have improved when cash became more of a scarcity. With this perspective, any excuse offered by Superior to delay distributions should have been reasonably viewed with suspicion.

---

[32]    (See Day 1 Tr. at 241, 244; Day 2 Tr. at 22-23).

[33]    According to Karen Sibbet, Presutti detested making Plan distributions to former employees:

> He just didn't feel it was right that he had to pay out this retirement fund or whatever you want to call it because he felt they didn't work for him all those years and he would get very nasty about it, very vulgar mouth.

(Day 1 Tr. at 219:1-12).

In sum, the alleged concealment is a red herring.  Neither Superior nor Presutti hid the fact that the distributions were not made, and the best evidence is the fact that the Sibbets never received a distribution payment from the Plan.  Because the Sibbets were entitled to Plan distributions within a reasonable time of submitting their claims, the failure to timely receive those payments gives rise to an actionable claim against the Plan.  In this case, the Sibbets waited too long to file the ERISA Complaint and now their ERISA actions are time barred.[34]

## C.

Upon determining that the Sibbets' ERISA claims are barred as a matter of law, the Court must now examine how this finding implicates the claims presented in the Amended Complaint.  The Court will address each cause of action in turn.

In Count I, the Sibbets seek to avoid the discharge of their claims under Section 523(a)(4).  Section 523(a)(4) effectively presents three distinct causes of action: (1) fraud or defalcation while acting in a fiduciary capacity; (2) embezzlement; or (3) larceny.  To establish grounds for nondischargeability based on fraud or defalcation, the debtor must be acting as a fiduciary.  Proof of a fiduciary relationship is not required for claims alleging embezzlement or larceny.

The Sibbets' could have sought relief according to each of the three legal theories afforded under Section 523(a)(4), but they focused exclusively upon the fiduciary duties owed by the Plan, and derivatively, Presutti.[35]  As the record amply

---

[34]    The Court need not determine at this time the validity of the allegations against Presutti.  The claims against him are time-barred regardless of their merit.

[35]    The Court observes that the Amended Complaint, Plaintiffs' Pretrial Memorandum [Dkt. No. 25], and the Post-Trial Brief of Plaintiffs [Dkt. No. 79] do not reference embezzlement or larceny.

demonstrates, the fiduciary duties at issue in Count I all spring from alleged violations of ERISA. Because the Court previously determined that the ERISA claims are time-barred by the three-year limitations period established under 29 U.S.C. § 1113, the Sibbets' claims under Count I cannot survive.

The claims alleged in Count II present a different story. In this cause of action, the Sibbets seek relief under Section 523(a)(2)(A) on the basis that Superior and its professionals made false representations about its efforts to value the Plan. The Sibbets also claim that Superior and Presutti committed actual fraud by converting company assets for Presutti's personal use. In pursuing these claims, the Sibbets again request that the Court pierce Superior's corporate veil to impose liability directly upon Presutti.

The Section 523(a)(2)(A) claims are similarly time-barred to the extent they implicate applicable ERISA law. The Court determines, however, that certain aspects of the fraud allegations contained within Count II may exist independently of ERISA and merit further consideration. For this reason, the Court will analyze the surviving portion of the Sibbets' Section 523(a)(2)(A) claim.

## III.

The Court begins its analysis of Count II with two fundamental principles that provide the foundation for this decision. First, the statutory exceptions to discharge set forth in Section 523 must be viewed in light of the underlying policy of the Bankruptcy Code: the goal of providing a fresh start to the debtor. Exceptions to a debtor's discharge "are generally construed 'narrowly against the creditor and in favor of the debtor.'" Boston Univ. v. Mehta (In re Mehta), 310 F.3d 308, 311 (3d Cir. 2002)

(quoting In re Pelkowski, 990 F.2d 737, 744 (3d Cir. 1993)).  The Sibbets, as the creditors opposing discharge, have the burden of establishing that an obligation is not dischargeable.  Id. (citing Grogan v. Garner, 498 U.S. 279, 112 L. Ed. 2d 755, 111. S. Ct. 654 (1991)).  Second, "there is a strong presumption in Pennsylvania against piercing the corporate veil."  Lumax Indus. v. Aultman, 669 A.2d 893, 895 (Pa. 1995).  To succeed in their dischargeability action, the Sibbets must overcome both presumptions.

The Court will start its analysis by examining whether Superior made false representations or engaged in actual fraud so as to satisfy the elements of Section 523(a)(2)(A).  If the Sibbets meet this threshold, the Court will then consider whether it is appropriate to pierce Superior's corporate veil for the purpose of imposing liability directly against Presutti.

## A.
### Analysis of Section 523(a)(2)(A)

Section 523(a)(2)(A) allows the court to except from discharge certain debts for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud."  To establish nondischargeability under section 523(a)(2)(A), the Sibbets must demonstrate that:

(1) debtor obtained money, property, services, or credit from plaintiffs through a material misrepresentation;

(2) debtor knew, at that time, that the representation was false or made it with gross recklessness as to its truth;

(3) debtor intended to deceive plaintiffs;

(4) plaintiffs reasonably relied on the false representation; and

(5) plaintiffs suffered injury as a proximate result of the materially false representation.

23

Seiler v. Farley, 156 B.R. 486, 490-91 (Bankr. W.D. Pa. 1993); see also Silver Care Ctr.

v. Parks (In re Parks), Case No. 05-37154, Adv. No. 05-2774, 2007 Bankr. LEXIS 2372,

at *30 (Bankr. D.N.J. July 10, 2007). Each of these elements must be proven by a

preponderance of the evidence. See In re Dressler, 431 B.R. 127 (Bankr. W.D. Pa. 2010).

The crux of the Sibbets' claims rest upon communications made by

Superior's professionals regarding an impending valuation of the Plan. In July 27, 2009,

Sunseri told the Sibbets that the "plan is being re-evaluated" in response to their inquiries

for payment. (See Plf. Ex. 57; Day 1 Tr. 88-89; Day 2 Tr. at 167-71). Then, in a letter

from Gunnett on June 17, 2010, the Sibbets were informed that the business had closed

and was now winding up its affairs:

> Please be advised that the Company recently ceased operations and
> is now in the process of terminating the Plan. Further information
> regarding the termination of the Plan and the distribution of all
> accrued benefits will be provided to all participants in the Plan
> shortly.

(Plf. Ex. 36).[36] The Sibbets claim they were misled by these statements and it prevented

them from receiving a distribution while Presutti proceeded to liquidate the company.

The Court finds that the Sibbets failed to sustain their burden. Neither

letter contains a misrepresentation, and the statements were not untrue when

communicated to the Sibbets. At the time the July 27, 2009 letter was written, Superior

was in the process of obtaining a stock valuation for 2008, and Superior ultimately

received the appraisal in October 2009. (Plf. Ex. 13). Similarly, Gunnett believed that

another stock valuation was underway in 2010. On June 2, he contacted Smith to request

an appraisal of the company for the purpose of obtaining a share value as of May 31,

2010. (Plf. Ex. 26; Day 1 Tr. at 150:15-151:4). In a follow-up e-mail on July 7, 2010,

---

[36] Gunnett was retained by Superior to provide advice with respect to the Plan and ERISA law.

Gunnett inquired as to the status of the appraisal and Plan termination efforts so that he could pass on the information to the Sibbets' attorney. (Plf. Ex. 5; Day 1 Tr. at 151). From this perspective, Superior was undertaking the preliminary steps necessary to obtain a valuation which would facilitate the termination of the Plan and distributions to the participants. Although Superior eventually failed to obtain a new valuation, this does not alter the fact that Gunnett's statement was accurate at the time it was made.

The lack of a false representation would ordinarily be fatal to a claim under Section 523(a)(2)(A). McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000). However, bankruptcy courts in this District and Circuit have recognized that "actual fraud" as used in Section 523(a)(2)(A) does not require a misrepresentation. Rather, actual fraud includes "any deceit, artifice, trick or design involving direct and active operation of the mind which is used to circumvent or deceive another." K-B Bldg. Co. v. Barber (In re Barber), 281 B.R. 617 624-25 (Bankr. W.D. Pa. 2002) (citing McClellan, 217 F.3d at 893, In re Vitanovich, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001). In those cases that subscribe to an expansive view of Section 523(a)(2)(A), the courts require proof of an intent to circumvent or deceive a party. Hendry v. Hendry (In re Hendry), 428 B.R. 68 81 (Bankr. D. Del. 2010) (Debtor was owner of only some units in apartment complex, but failed to disclose extent of ownership and collected from some parties whose units he did not own); Onusic v. Draughon (In re Draughon), 2007 Bankr. LEXIS 5049, at *14-15 (Bankr. W.D. Pa. 2007) (Debtors shuffled a property secured by notes among themselves but did not notify secured creditor of the owners of record); Hillmeyer v. Deller (In re Deller), 2009 Bankr. LEXIS 5556, at *14-15 (Bankr. W.D. Pa.

November 13, 2009) (Debtor illegally executed assignment of title to cars on his sales lot to deceive owner).

The Sibbets contend that Presutti committed actual fraud by using corporate funds to pay a host of personal expenses, including his country club membership dues and certain travel and entertainment expenses. They also challenge the payments Superior made to Innovative since it was a company wholly owned by Presutti. Presutti defends the expenditures, claiming these payments were for legitimate business expenses.

Even when viewed through the lens of "actual fraud," the Court finds that the Sibbets have fallen short of sustaining their burden of proof. The Sibbets have not conclusively established the impropriety of these expenses,[37] and the record is clear that the charges were never concealed. The Court therefore cannot conclude that the expenses were incurred as part of an attempt at deceit, artifice, trick, or design. Karen Sibbet testified that she knew of the payments made by the company for most of these expenses. (Day 2 Tr. at 27). Indeed, there is evidence in the record that she signed some of the checks issued by Superior to pay for the expenses she now questions. (See Plf. Ex. 30). The Court also notes that the payments to Innovative were disclosed as "Related Party Transactions" in the financial statements issued by Kitay, Lawrence, Rauker & Associates, LLC (Def. Ex. 2).[38] Finally, the Court is persuaded by the testimony of

---

[37]   The Court is troubled by a $3,295 charge for cosmetic surgery that was expensed to the Company, and for which Presutti does not offer a credible explanation. (Day 2 Tr. at 126). Nevertheless, the Court concludes that this expense, on its own, does not constitute the proximate cause of the Plan's failure to make distributions to the Sibbets.

[38]   There is evidence in the record that Innovative took over the tech support responsibilities at Superior when the company's IT employee was fired for cause. (See Day 2 Tr. at 40-41). The parties have not disputed that Superior was in need of such services, nor has it been shown by a preponderance of the evidence that the fees charged by Innovative were excessive.

26

Smith, who issued an independent appraisal of the Superior stock value each year. Smith testified that he found no evidence of Superior using company funds to satisfy personal expenses, even though he would consider such information relevant to his valuation. (Day 1 Tr. at 156:2-3).

The Sibbets have not shown by a preponderance of the evidence that any of the challenged expenses, standing alone or as part of a pattern, were done to deceive or circumvent the Sibbets, or to cause a decline in Superior's stock value.   Upon consideration of the record, the Sibbets have failed to produce sufficient evidence to overcome the presumption favoring a debtor's right to a "fresh start." Accordingly, the Sibbets shall not prevail on Count II and no debts should be excepted from discharge pursuant to section 523(a)(2)(A).   Having determined that the Sibbets were unable to satisfy their burden under Section 523(a)(2)(A), the Court finds it unnecessary to determine whether they may pierce Superior's corporate veil in an effort to reach Presutti.

## IV.

Based upon the reasons set forth above, the Sibbets' claims under Counts I, II, and III are denied with prejudice.   Provided that Presutti completes his plan payments and otherwise meets the eligibility requirements set forth in the Bankruptcy Code, the Sibbets' claims against Presutti may be discharged.   Any claims the Sibbets have against Superior or the Plan remain unaffected by this decision.

Dated:  October 9, 2015

_____
GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE

<u>Case Administrator to Mail to:</u>
Marc A. Presutti
Mary Bower Sheats, Esq.
Karen Sibbet
George Sibbet, Jr.
Brendan Sibbet
Daniel M. Taylor, Jr., Esq.
Ronda J. Winnecour, Esq.
Office of the U.S. Trustee